Okay, our final case this morning is number 161544, Phigenix, Inc. v. Immunogen, Inc. May it please the Court, the Board's non-obviousness finding here should be reversed for two reasons. Let's start with standing, okay, which is a problem because under the Supreme Court's decision in Massachusetts, even if the statute gives you the right to appeal, there still has to be injury in fact. And this whole royalty stacking argument, which is really your only argument for standing, has no application where there's no interest in anybody's licensing your patent. Why would that change if the other patent that's involved here, the 856, isn't validated? Well, first, Your Honor, the royalty stacking wasn't the only argument that was raised. The concrete and particularized injury that was discussed was the devaluation of the patent portfolio of Phigenix due to the overlapping 856 patent that we have here. And this case is very different. Why isn't that the same as royalty stacking? Well, because the patent is being devalued due to the overlapping subject matter. It's not only the fact that Genentech is paying royalties to Immunogen. It's the fact that there is this overlapping subject matter, which has to do with patents on the same drug, Cadsilla. How do we know that? How do we, as an appellate court, since this wasn't really raised below, know that your patent actually does cover this drug, and it upset their patent, somebody was licensing yours? Well, actually, there was three months of negotiations between Phigenix and Genentech, leading up to a litigation that's currently going on with Genentech involving the Phigenix patent. I don't think that answers my question. I mean, the fact that they may have negotiated with you doesn't mean that they think they're cut to cover as a product. They may have just entered into negotiations to see if they had any risk of infringing. And where is that in the record? That is in the record, Your Honor, at Docket Entry 26 and Exhibits 1 and 2. Now, give me an appendix number, and I want you to show me where the content of the negotiations shows what you're saying. There is an appendix number 6530, which is a June 2013. Which volume is this in?  You're referring to a letter which follows. Right. There is a letter at that appendix 6530, which was the beginning of the negotiations between Phigenix and Genentech, which carried on. But this isn't your letter saying we think you should license our product. It doesn't show anything about whether we have any interest whatsoever in licensing your product. Well, the negotiations went back and forth. Where is that in the record? The record continues on at 6543, where the negotiations finally ended. Wait a minute. This is, in the first place, we'll use the word self-serving. In the second place, we'll say it lacks any foundation. How on earth are we supposed to consider this as cognizable evidence of the assertion you just made? Well, the evidence was part of the motion to dismiss record, which was that docket entry 26. There were two declarations submitted as part of the motion to dismiss that was passed to the... And where is that in the appendix, please? That's in the motion to dismiss. That is in the motion to dismiss. Submitted to us. Oh, oh, oh. Yes. Oh.  I don't have that before me. I'll have it in the appendix. What is that evidence? Is it their evidence? Because this is just your recharacterization of your patent profile. That evidence is a declaration from the CEO of Phigenics, which was... How does anything from you help? I think what we're looking for is any suggestion beyond your assertion that they would have a licensure patent, or whoever they were licensing their patent to. You keep pointing to your characterization, but your mere assertion doesn't seem to be enough. Well, the parties, the Genentech and Phigenics are in litigation. That may well result in the end of Genentech having to take a license. That's often how licenses... That's totally speculative. We're supposed to say you have injury because you might win this litigation, and then if you do win the litigation, they have to license your patent, and if they license your patent, they might give you less. If the 856 patent is still valid. It's all this whole string of assumptions. I use the word non-cognizable. One of the reasons a court can't take into account something as evidence is because it's speculative. That's an objection. And this is, as Judge Dyke says, this is speculative. Under the Spokio Supreme Court case, the harm can be intangible or a risk of real harm. And here, since we have a statutory right... But it can't be speculative, right? It cannot be speculative, but a risk of harm certainly exists here. Certainly to the same extent... You mean like a possibility of success is the equivalent of a risk of harm, even if it's infinitely infinitesimal? It's not infinitesimal. It's a significant enough risk that a for-profit company that competes directly with Immunogen for licensing patents in the same area... I'm sorry. I mean, I get it. If what you're saying is true, then maybe you have standing. But there's no evidence in here. And I understand it's an odd situation because you're not coming up from a district court. But the D.C. Circuit does this all the time, and they look at this, and they let people make standing arguments. And you've made standing arguments, but you can't point to any evidence. Well, the evidence that I can point to was in the opposition to the motion to dismiss, which were the two declarations, not only from the CEO of Phygenics, but also Exhibit 2 at Docket Entry 26 was an economic expert who opined as to the economic harm that Phygenics has with respect to the devaluation. Look, there's no doubt that if your patent actually covers the same drug, that perhaps they would be forced to take a license to it. They'd have harm. Now, is there evidence that we can rely on that your patent actually covers this drug? There is, Your Honor. Beyond mere argument in these negotiations letters. There is, Your Honor. And I'll come back to that and give you that appendix cite in my rebuttal. Is that going to be from some kind of expert witness or something like that, rather than just attorneys asserting it? That was evidence of why the drugs overlap, and specifically the mechanisms of action and how the claims of the patent overlap and cover the same drug. From a fool? That is in a letter from Phygenics to Genentech explaining the mechanism of the action. Is it going to be a letter signed by an attorney? Not now, Your Honor. So the evidence you're offering includes a declaration by a, I would guess, an economist, somebody who specializes in any case in investment banking, in which he says, it is my understanding that Phygenics has developed and is developing and so on. He doesn't know. I mean, what kind of evidence is that? Sure, it's maybe the basis for expert testimony about valuation or damages, but it's not evidence supporting your assertion of the validity of your claim, right? At paragraph four of Dr. Gold's declaration, he opines that Phygenics has suffered economic harm due to the existence of the 856 patent, and he goes on and states that that's because the value of the Phygenics portfolio is diminished. We haven't gotten a dime yet from your patent, right? Nobody's paid any money to license it, right? That is correct, Your Honor, but part of the reason for that is the direct interference with the 856 patent. That I don't understand. Why would the existence of the 856 patent cause somebody not to license your patent? They've got to consider whether your patent covers the product they're producing or not without regard to the other patent, don't they? They do, and there is a lawsuit that's going on right now to determine that. I can ask the same questions different ways. On the non-obviousness finding, the board basically used the wrong reasonable expectation of success here. In its institution decision, it said that one would have a reasonable expectation to make the compounds, and that's at Appendix 187. But in the final decision, they reversed course, deviated, and said, looked at the toxicity instead of whether the immunoconjugates would be reasonably expected to be able to be made, which was the test they set out in the institution decision. Here, the prior art uses two of the same three linkers, two of the same three precise compounds, and only deviates with the antibody. And there was an express teaching in the Chari reference to use the same antibody. And had the board used the proper test, they should have found that the claims were obvious. I'll reserve my time for that. Thank you. Ms. Allison. Good morning, Your Honor. May it please the Court, Patent Owner Munigen respectfully submits that this Court should dismiss Vigenix's appeal under Consumer Watchdog. Vigenix lacks standing in this case because it does indeed lack an injury in fact. I will also turn to the merits of the appeal. On the standing issues, suppose they had established that people had licensed their patent, the 554 patent, and that those people had also licensed the 856. And they said, if we can get rid of the 856, they'll pay us more for the licenses on our patent. Would that be injury in fact sufficient to allow them to appeal? It certainly would get them a lot closer to having standing in this case. But, of course, the facts are nowhere near that. I understand that. But what's the answer? Do you have a position on whether that would give them standing or not? It would get them a lot closer, Your Honor. That's all we're going to get from you. Well, I think this Court recognizes that each case should be considered on its own merits and look at the facts of each case. And so as the facts of your hypothetical suggested, it suggests that there's an economic injury. And I recognize that the Supreme Court suggests that there's an economic injury directly related to your patent being viable. It seems to me that that's enough for injury in fact. That may be their theory. Their problem is they have no proof of their theory, and it's too speculative. But if they actually had, as my colleague says, licensing activity with other people and suggestions that their licenses aren't as much because of your patent, then it seems to me to be concrete and particularized. I agree that that would get them much closer to having standing, and perhaps even would get them standing. You're looking for other facts in the hypothetical that we haven't discussed. Is that right? But what's clear based on the facts here is that Figenics lacks standing. They haven't produced these potential licensees who expressed any interest whatsoever in their IP, let alone a potential licensee who has concerns about the 856 patent. They claim that the claims are overlapping, yet they've produced no evidence in this case to demonstrate that. So their pleadings are full of assertions, but those assertions are not supported by actual underlying proof and evidence. They rely upon the declaration of Dr. Donald, which of course is self-serving, as he's the CEO of Figenics. I have a kind of procedural and standard review question about this. Given that there's no standing requirement at the board, and that this is all presented to us on appeal for the first time, are we essentially being asked to make some kind of de novo factual determination of whether there is an injury or not? Well, it's always a court's duty, frankly, to consider whether an appellant has standing, and the burden lies with the appellant to demonstrate that they have standing. And it's the court's, you know, it's part of, I submit with respect, it's part of your job to assess whether an appellant has standing. Oh, but then I think the question is where should the record be made? Here. Here, and they don't have to make the record with both patent offices? That's correct. And even the Supreme Court has alluded to this in the Quozo case, where the Supreme Court noted that IPRs are more like an administrative agency proceeding than a judicial proceeding, and that one could seek an IPR, yet lack Article III standing. The Supreme Court says that in their Quozo decision, which I can quote. That seems to me to be putting quite a burden on this court. We don't usually engage in fact-finding. Why shouldn't a petitioner be required to make the record on standing before the patent office, as opposed to coming in here and asking us for the opportunity to have an evidentiary submission and evidentiary findings? Well, a party may not have Article III standing to initiate an IPR, but as this court acknowledged in Consumer Watchdog, once that party seeks the review by a federal court like this court, Article III standing requirements kick in. And it was Phygenics, of course, that chose when to file its IPR. They could have chosen to file their IPR later when, in theory, they might actually have suffered an injury or might be in imminent danger of suffering an injury. Or might have evidence. Sorry? Or might have evidence. Or might have evidence, which is severely lacking in this case. And, of course, this requirement for an injury in fact or an imminent injury in fact, it's a hard floor of Article III. That's what the Supreme Court has explained in cases like, I think it was the Summers case, the Massachusetts versus DPA case. And even though other requirements of Article III, like immediacy and redressability, can be relaxed, an injury in fact is a hard floor that cannot be removed by Congress. I want you to further scrutinize Dr. Donald's statement because you simply say it's self-serving. And I looked at it, and while I agree with you it's self-serving, I also found that it lacked an awful lot of evidentiary requirements. And I want you to go through that. Sure. So, for instance, Phygenics has not presented any third party, not identified any third party, that might have an interest in licensing their 534 patent, let alone have a need to license the 856 patent. The magic word for me is in paragraph 9 in which Dr. Donald says, thus. It's that one. Work backwards from there. Certainly. He says, thus Phygenics directly competes with Immunogen with respect to those licenses. And work backwards from there. Okay. Because he's basing that on the prior statements, which do nothing for me. Right. So Phygenics presents itself as though it were an early stage biotechnology company. But if you look at, for instance, the declaration of Dr. Christine Meyer that we submitted, which is in the record at, I'll get you that site in just one second. We've assessed Phygenics' activities, and what it shows is that Phygenics is not engaged in any of the kind of activities that you would expect from an early stage biotechnology company that is seeking to market a biosimilar of Kitsila. It's not engaged in clinical trials. It poses no infringement risk, as they've essentially conceded in their opposition, or their response to our motion to dismiss. They don't allege that they face any infringement risk, which of course was an issue for this court in the Consumer Watchdog case. They're not partnering with any other large companies to bring a drug to market. And so this idea that they compete is based solely upon their theory that they compete in licensing. But even that there's no proof of. So, for instance, they have, again, not identified any party that is considering licenses to both patents. And the 856 patent of Immunogen has been exclusively licensed to Genentech since 2000. And so there is no competition for a license to both patents. It's simply wishful thinking on the part of Phygenics, and they presented no proof thereof. That docket entry that I was trying to refer to earlier is Docket 23, Exhibit G, and I apologize that certain documents weren't introduced into the joint appendix, and we'd be happy to fix that if you'd like afterwards. So Dr. Donald alleges that Phygenics and Genentech have engaged in multiple discussions about the 534 patent. But what the record shows is that Genentech refused to license Phygenics' 534 patent because Genentech thinks that patent is invalid. It has nothing to do with the 856 patent. Genentech refused to license that patent on completely other grounds. So this notion that the 856 is standing in the way of Phygenics gaining royalties or having Genentech pay money to Phygenics is just, frankly, wishful thinking on their part, and it's not supported by any documentary evidence or any evidence from third parties. Does that adequately address your question? Yes, it does. Okay. Thank you. So Phygenics alleged certain theories for harm, none of which is viable. They didn't allege an infringement risk, which is something that this court again looked at under Consumer Watchdog. They made this allegation about Genentech paying Immunogen millions of dollars as opposed to paying fees in Phygenics, but as I just discussed, that allegation is without support. They allege that invalidating the 856 patent would immediately increase the license value of Phygenics' IP portfolio, but again, that's unsupported. They put in testimony from Dr. Gold, an economist, who makes these generalized theories, but he provides no valuation whatsoever of the market. They've shown no interest whatsoever in a market for a license to the 534 patent, let alone any interest that's affected by the existence of the 856 patent. So their royalty stacking theory also lacks concreteness. It's merely hypothetical and conjectural, which courts have over and over again say is insufficient to demonstrate harm. And then they also make an argument based on estoppel. They argue that they can no longer provide a full warranty that practicing Phygenics' 534 patent will not infringe Immunogen's 856 patent. But again, they have failed to identify even a single entity that has an interest in licensing the 534 patent and who would also need a warranty to the 856 patent. So this supposed harm, again, is just purely conjectural and hypothetical on their part, and it's not concrete, and it doesn't meet Article III's requirements. As this court noted in Consumer Watchdog, an estoppel without an estoppel effect does no harm. Unless there are any further questions on this standing issue, I'll turn to the merits just briefly, if you even want to hear that. It's important to note that the board below upheld the patentability of our claims for multiple reasons, based on a well-developed record that was full of evidence, and it's full of the kind of substantial evidence that this court looks at the record for. So below, Phygenics failed to demonstrate that there was a reason to combine to arrive at the claimed invention. The board found that. They failed to demonstrate that one would have had a reasonable expectation of success. Claims 6 and 8, which are directed to immunoconjugates that include a non-cleavable linker, the board found for additional reasons that those claims were not shown to be unpatentable. And then also with respect to Claim 8, we submitted objective evidence of non-obviousness, which the board also considered substantial evidence of non-obviousness. And each of the board's fact findings was supported by substantial evidence, including declarations of multiple experts. We submitted four expert declarations, three of whom Phygenics didn't even oppose or submit rebuttal expert testimony against. Their reply was based purely on attorney argument and was not supported by any expert testimony. And so the board, weighing these facts, understandably found that Phygenics had failed to meet its burden, and I submit that this court, in reviewing the board's decision, will see that the board's decision is supported by substantial evidence. Of course, questions of motivation and reasonable expectation of success are reviewed for substantial evidence by this court. I would also like to note that Phygenics' appeal makes numerous new arguments that we submit this court should not consider on appeal. So for instance, Phygenics now argues that there are multiple non-clinical reasons to combine the elements of the prior art to arrive at the claim invention, and they do this on page 27 of their blue brief. Yet these arguments were not advanced below. They're new arguments that should not be considered here. And as this court has recognized in cases like magnum oil or even in red line detection, you should not consider such new arguments, but you should consider whether the board properly based its decision on the arguments that were made below, and that's what happened here. In the underlying IPR, Phygenics argued solely clinical reasons to combine the elements of the prior art to arrive at the claim invention, and they did as much the same with reasonable expectation of success. I'll also note that on appeal, Phygenics, in addition to making new arguments about non-clinical uses, makes new arguments improperly about whether the prior art would have thought that a non-cleavable linker would release a metangenoid in the cell, and that's a new argument that should not be considered here. And then additionally, I'd like to note that on appeal, Phygenics argues something that shows a fundamental misunderstanding of the science at issue here. So, for instance, at page 14 of their blue brief, they say that the TA1 antibody, which was in the Charia reference discussed below, is just like trastuzumab, which is an alternative name for Herceptin, and they go on to say, except that TA1 is a mouse antibody while trastuzumab is the humanized antibody. And their arguments here are premised on this, but that's just fundamentally incorrect. Trastuzumab is not the humanized version of the TA1 antibody. Trastuzumab is a humanized version of an antibody known as 4D5. And so even Phygenics' new arguments that they submit here on appeal are flawed. In contrast, looking at the board's decision below, the board did apply the correct legal standard, and they did this in the final written decision, which is at appendix 20 going on 21, where they asked whether a skilled artisan would have had a reason to combine the teachings of the prior art to achieve the claimed invention, and whether they would have had a reasonable expectation of success from doing so. And then the board's decision, both for its reasons to combine and its reasonable expectation of success, looked at the arguments that Phygenics advanced. And the board, throughout its final written decision, repeatedly cites underlying evidence that supports the factual conclusions that the board has drawn there. And unless there are any further questions, I see that I'm out of time, and I'll leave it at that. Thank you, Ms. Allison. Thank you. Mr. Porter, you have some rebuttal time. Your Honor, on the standing issue, there is no procedure to make a record of that at the PTO. The record was made here at the docket entry 26, Exhibits 1 and 2. There wasn't any rebuttal declaration submitted, so really the only evidence that's in the record are the two documents and the two declarations that I discussed earlier. In regard to the obviousness and the mistakes made by the PTAB, the key mistake was on the expectation of success. The original petition did not set it up as clinical reasons only. Throughout the petition at Appendix 5999, 6000, and 6001, the rationale... Wait a minute. Your statement's not correct. You said the only evidence is the two declarations you discussed, but there are also declarations I just looked at attached to the motion to dismiss as well. Those declarations, I'm sorry if I misspoke, do not directly address the economic harm that Phygenics... The injury, in fact, of Phygenics economic harm. Somebody might think they do. Coming back to the mistake that the board made was that they made a reason to expect clinical success or non-toxicity, and that wasn't what the petition was based on, nor was it what the institution decision was based on. It's a compound claim, and therefore, for the composition, toxicity is not an element of the claim. Yet the board used referencing toxicity to say that there wouldn't be a reasonable expectation of success to make the compounds, which isn't true. They conflated the method of use or method of treatment standard, where you would look at clinical effectiveness and toxicity, with the standard for a compound claim of obviousness, which is simply, would one have an expectation of success in making the compounds? And here, there clearly was an expectation of success in making the compounds. Their expert admitted that at Appendix 878, that the type of process to make the compound was well-known, and that's why it's obvious, and that's why it should be reversed. Okay. Thank you, Mr. Porter. Thank both counsel. The case is submitted, and that concludes our session for today. All rise.